# In the United States Court of Federal Claims

No. 16-1017C

(E-Filed:  December 8, 2017)

| | |
|---|---|
| RUSSELL B. WELTY, et al., ) | |
| ) | Motion to Dismiss; RCFC 12(b)(1); |
| Plaintiffs, ) | RCFC 12(b)(6); Fifth Amendment |
| ) | Takings; Statute of Limitations; |
| v. ) | Accrual Suspension; Stabilization |
| ) | Doctrine. |
| THE UNITED STATES, ) | |
| ) | |
| Defendant. ) | |

Alexander J. E. English, Bethesda, MD, for plaintiffs.

Kristine S. Tardiff, Trial Attorney, with whom were Jeffrey H. Wood, Acting Assistant Attorney General, and Barbara M. R. Marvin, Environment and Natural Resources Division, United States Department of Justice, Washington, DC, for defendant.

OPINION

CAMPBELL-SMITH, Judge.

     Before the court is defendant's motion to dismiss plaintiffs' complaint, in which they allege a taking of certain property along the Whitewater River in Cape Girardeau County, Missouri, through inverse condemnation.  See Compl., ECF No. 1.  Defendant contends that this court lacks jurisdiction to consider plaintiffs' claim, pursuant to Rule 12(b)(1) of the Rules of the Court of Federal Claims (RCFC), and in the alternative, moves to dismiss the claim for failure to state a claim upon which relief can be granted, pursuant to RCFC 12(b)(6).  See Def.'s Am. Mot. to Dismiss, ECF No. 21 at 9.  For the following reasons, defendant's motion to dismiss is **GRANTED.**

I.    Background

     In the complaint, plaintiffs claim that defendant is liable for "a taking of their land and other property . . . for public use through inverse condemnation, without exercising

the power of eminent domain and without providing Plaintiffs just compensation therefor, in violation of the U.S. Constitution, federal statutes, and federal regulations." ECF No. 1 at 1. Specifically, plaintiffs allege that the United States Department of Agriculture (USDA), the Commodity Credit Corporation (CCC), the United States Corps of Engineers (USCE), and the Natural Resource Conservation Service (NRCS) "requir[ed] and/or approv[ed] the construction and maintenance (improper or otherwise) of a levee . . . on a conservation easement . . . on the property immediately south of and downstream from" plaintiffs' property. See id. at 2. Plaintiffs further allege that the levee set in motion "gradual physical processes" that resulted in "increasingly frequent and severe flooding of Plaintiffs' land and property." See id. According to plaintiffs, these actions amounted to "the taking of a flowage easement across the Welty Farm." Id. at 10.

Plaintiffs in this case are three siblings who inherited the family property as joint tenants with rights of survivorship when their mother passed, on March 18, 2016. See id. at 5. The levee that plaintiffs claim caused the flooding that damaged their property was allegedly constructed by Mr. Terry Givens (Givens), on property located south of plaintiffs' property along the Whitewater River. See id. Plaintiffs allege that Givens began constructing the levee at some point between the time he purchased the property in 1998, and when the levee failed during a flood in 1999, see id. at 5-6, but plaintiffs attach to their complaint an affidavit dated May 24, 2016, signed by Givens in which he attests that part of the levee was present on the property when he purchased it, see Compl., Exh. 7, ECF No. 1-2 at 38. Plaintiff Russell B. Welty (Welty) registered a complaint with the NRSC and USCE following the 1999 levee failure. See ECF No. 1 at 6. As a result of those complaints, the NRSC determined that Givens had "manipulated the wetland system." Id.

Plaintiffs allege that "[n]o later than October of 2000, with the approval, input, and oversight of the United States, Givens constructed or caused to be constructed a three-foot levee—and in some locations as high as ten feet—along the western edge and northwest corner of his property." Id. Givens subsequently entered into an agreement to enroll his property in the Conservation Reserve Program (CRP). See id. at 6. Plaintiffs allege that these agreements were entered into in August of 2010, but were retroactively dated to cover the period spanning from October 1, 2000 to September 30, 2010. See id. at 7. Plaintiffs then claim that on May 9, 2013, the property was re-enrolled in the CRP in an agreement that was retroactively dated to reflect an effective date of October 1, 2010, and an expiration date of September 30, 2025. See id.

According to plaintiffs, defendant was aware of the levee at all relevant times, and the conservation plans developed in connection with the CRP demonstrate defendant's control over the levee. Plaintiffs state: "The nature of the Easement, and the control over the terms of the Plan exerted by USDA, CCC, and NRCS clearly demonstrates that

2

the United States did, in fact, have responsibility for and involvement with the Levee, although Welty was not aware of the government's responsibility or involvement until this year (2016)." Id. at 7-8.   Given defendant's involvement with the levee, plaintiffs allege that "[t]he United States knew, or reasonably should have known, the effects of its actions in approving or requiring the maintenance of a levee on neighboring, upstream landowners."  Id. at 8.

Plaintiffs claim that they were unaware, until August 5, 2013, that the levee "would result in a permanent loss of any of the Welty Farm, due to increased inundation and flooding."  Id. at 9.   They also state that they were unaware, until September 16, 2014, that the flooding caused by the levee "would result in the permanent loss of all beneficial use of the Welty Farm as productive agricultural land."  Id.   In support of these claims, plaintiffs cite to an exhibit to the complaint referred to as the Welty Farm Profit/Loss Reconciliations.  See Compl., Exh. 3, ECF No. 1-2 at 11-22.   The documents comprising this exhibit reflect purported profit and loss figures for various years, but do not attribute any losses to flood waters, or any other specific factor.  See id.

It is plaintiffs' contention that even if they should have been aware that a taking had occurred, or was occurring, prior to August 5, 2013, defendant concealed its involvement with the levee.  See ECF No. 1 at 9.   As evidence of concealment, plaintiffs refer to a letter dated July 31, 2015, in which the USDA informs plaintiffs' counsel that plaintiffs' Freedom of Information Act (FOIA) request covers certain information classified as confidential, except to the extent that it relates to Welty.  See Compl., Exh. 2, ECF No. 1-2 at 10.   Plaintiffs state that they were unaware of defendant's "involvement with or control over the Levee until such fact was disclosed by Givens in a separate state court filing on March 14, 2016."  See ECF No. 1 at 9.

The court filings to which plaintiffs refer are an affidavit made by Terry N. Givens, see Compl., Exh. 7, ECF No. 1-2 at 38-41, and a motion to dismiss filed by Givens, see Compl., Exh. 8, ECF No. 1-2 at 42-47.   The documents were filed in connection with a lawsuit that plaintiffs filed against Givens on December 23, 2014, Welty v. Givens, Case No. 14CG-CC00268 (Mo. Cir. Ct. of Cape Girardeau County).  See Def.'s Am. Mot. to Dismiss, Exh. 7, ECF No. 21-1 at 208 (docket sheet).   In the affidavit, Givens states that his farm "has been enrolled in a conservation program since 1998."  Compl., Exh. 7, ECF No. 1-2 at 38.   Givens describes that program as involving "the building and maintenance of a filter strip around the perimeter of my farm which adjoins the Welty farm," in order to "protect bank erosion of the Whitewater River, provide wildlife habitat and serve as a buffer and filter between the farmland and the Whitewater River."  See id. at 38-39.   Givens also states that removal of the levee would "substantially eliminate and destroy the filter strip," which would in turn, "[b]reach the terms of my conservation contract" with defendant.  See id.   In the motion

3

to dismiss, Givens alleges that "[t]he levee along Whitewater River of which Welty complains as well as other land in the Givens farm is enrolled in the conservation plan which establishes an easement for a filter strip and levee," Compl., Exh. 8, ECF No. 1-2 at 43, and that "the conservation easements between Givens and the Commodity Credit Corporation contain significant penalties for failure to maintain the filter strip through September of 2025," id. at 45.  Givens also claims in the motion to dismiss, that if the state court "granted the relief requested by Welty Givens [sic] the judgment would be in breach of the four Conservation Reserve Program Contracts."  Id.

Defendant provides additional detail with regard to the history of plaintiffs' complaints about the levee.  As plaintiffs allege, Welty complained to the NRCS and USCE following the 1999 levee failure.  See ECF No. 21 at 13.  Defendant, however, recounts further discussions between NRCS and Welty following that initial complaint.  In a letter dated January 28, 1999, Mr. Roger Hansen with NRCS memorialized a telephone conversation between Welty and Mr. Clayton Lee, a soil scientist with the NRCS.  See Def.'s Am. Mot. to Dismiss, Exh. 1, ECF No. 21-1 at 21.  The letter read, in relevant part, as follows:

> This letter is a follow-up to your January 21, 1999, phone call to this office.  During the discussion with Clayton Lee, Soil Scientist, you indicated that your neighbor had converted a wetland on your property line.  You indicated that Natural Resources Conservation Service (NRCS) staff had authorized the action.  We contacted our staff in the Jackson Wetland Office and offer the following information to you.
>
> The NRCS administers the Food Security Act (FSA), as amended.  The wetland provision of the FSA must be followed in order for a person to remain eligible for USDA program benefits.  Participation in USDA programs is strictly voluntary.  If NRCS determines that a person converts a wetland by draining, dredging, filling, leveling, removing woody vegetation, or other means for the purpose, or to have the effect, of making the production of an agricultural commodity possible, they will be in violation of the FSA.  The actions taken by your neighbor did not make possible the production of an agricultural commodity crop and therefore did not violate the FSA.

Id.

Welty responded to the NRCS's letter, reiterating his belief that "[t]he NRCS authorized work to [Givens's] farm," and that the authorized work "caused damage to include approximately 20 acres of [Welty's] farmland."  See id. at 23. The letter also

states that "the 2 1/2 to 3 ft. dirt fill that Mr. Givens created along my property line on the south side could have caused a water holding effect had the river not risen to cut away the dirt fill."  Id. at 24.  Defendant contends that the "2 1/2 to 3 ft. dirt fill" is a reference to the levee that failed, demonstrating plaintiffs' awareness of its existence as of February 15, 1999, the date of the letter.  See ECF No. 21 at 14.

The record in this case reflects continued correspondence between the NRCS and Welty, including the following letters:  (1) a March 9, 1999 letter from NRCS to Welty reporting the conclusions of a field review and offering assistance to managing issues relating to wetlands and adjoining property, see Def.'s Am. Mot. to Dismiss, Exh. 1, ECF No. 21-1 at 28; (2) a March 15, 1999 letter from NRCS to Welty, enclosing regulatory materials requested by Welty and providing instructions for Welty to pursue a "complete wetland inventory" of his property, id. at 29; (3) a March 22, 1999 letter from Welty to NRCS requesting an appeal of NRCS's decision that Givens had not violated the Food Security Act, see id. at 30-31; and (4) a April 1, 1999 letter from NRCS to Welty directing Welty to discuss his concerns with Givens, see id. at 33.  Welty filed an appeal with the USDA's National Appeals Division (NAD) in April 1999, which was dismissed for lack of jurisdiction after the agency concluded that Welty failed to prove that the NRCS "has taken or failed to take action directly against you."  See id. at 98.  The NAD Director affirmed the decision on July 14, 1999.  See id. at 117-19.

Almost six years later, on June 13, 2005, Welty filed a complaint against the United States in the United States District Court for the Eastern District of Missouri, Welty v. United States, Case No. 1:05-cv-92.  In the complaint, Welty asks the court, in part, to order the "Dam and Levy system that was built by Terry Givens on his adjoining farm be removed due to redirection of flood waters across my farmland and wetlands."  See Def.'s Am. Mot. to Dismiss, Exh. 3, ECF No. 21-1 at 171.  The case was dismissed for lack of jurisdiction.  See Def.'s Am. Mot. to Dismiss, Exh. 5, ECF No. 21-1 at 193-201.  The subsequent appeal to Eighth Circuit was dismissed for failure to comply with a court order.  Def.'s Am. Mot. to Dismiss, Exh. 4, ECF No. 21-1 at 204.

As noted above, plaintiffs filed a lawsuit against Givens in Missouri state court on December 23, 2014.  See Def.'s Am. Mot. to Dismiss, Exh. 7, ECF No. 21-1 at 208 (docket sheet).  In the fifth, and final, amended state court complaint, plaintiffs claim that Givens's drainage ditch and levee system caused "the force of headwaters of the Whitewater River to occasionally flow more heavily over Plaintiffs' property, altering the natural drainage patterns, . . . damaging Plaintiffs' farming and rendering Plaintiffs' property unfit for cultivation."  See Def.'s Am. Mot. to Dismiss, Exh. 10, ECF No. 21-1 at 249-50.  Plaintiffs specify in the fifth amended complaint that the levee system built in 1998 and 1999 is the source of the alleged damage.  See id. at 251.  The case was ultimately dismissed without a written opinion and without prejudice, on October 3,

2016.  See Def.'s Am. Mot. to Dismiss, Exh. 12, ECF No. 21-1 at 266 (judge's order sustaining motion to dismiss); Def.'s Am. Mot. to Dismiss, Exh. 7, ECF No. 21-1 at 216 (docket entry noting dismissal without prejudice).  The complaint in the case at bar was filed a month and a half prior to dismissal of the state court action, on August 17, 2016. See ECF No. 1 at 1.

II.     Legal Standards

Defendant argues that plaintiffs' complaint should be dismissed for lack of jurisdiction, see RCFC 12(b)(1), or in the alternative, for failure to state a claim on which relief can be granted, see RCFC 12(b)(6).

  A.    Dismissal for Lack of Jurisdiction

Pursuant to the Tucker Act, the court has jurisdiction to consider "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1) (2012).  To invoke the court's jurisdiction, plaintiffs must show that their claims are based upon the Constitution, a statute, or a regulation that "can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained."  United States v. Mitchell, 463 U.S. 206, 216-17 (1983) (quoting United States v. Testan, 424 U.S. 392, 400 (1976)).

The Fifth Amendment to the Constitution of the United States provides that the federal government may not appropriate private property "for public use, without just compensation."  U.S. Const. amend. V.  As such, takings claims for just compensation meet this jurisdictional criteria.  "When the Government takes property but fails to compensate the owner, the Tucker Act provides jurisdiction to enforce the owner's compensatory right."  Mildenberger v. United States, 643 F.3d 938, 944-45 (Fed. Cir. 2011) (citing Boling v. United States, 220 F.3d 1365, 1370 (Fed. Cir. 2000)); Jan's Helicopter Serv., Inc. v. United States, 525 F.3d 1299, 1309 (Fed. Cir. 2008) ("It is undisputed that the Takings Clause of the Fifth Amendment is a money-mandating source for purposes of Tucker Act jurisdiction.").

Plaintiffs bear the burden of establishing this court's subject matter jurisdiction by a preponderance of the evidence.  See Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988).  In reviewing plaintiffs' allegations in support of jurisdiction, the court must presume all undisputed facts are true and construe all reasonable inferences in plaintiffs' favor.  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), abrogated on other grounds by Harlow v. Fitzgerald, 457 U.S. 800, 814-15 (1982);

6

Reynolds, 846 F.2d at 747 (citations omitted). If, however, a motion to dismiss "challenges the truth of the jurisdictional facts alleged in the complaint, the . . . court may consider relevant evidence in order to resolve the factual dispute." Id. at 747. If the court determines that it lacks subject matter jurisdiction, it must dismiss the complaint. See RCFC 12(h)(3).

Claims in this court must be brought within six years of accrual, or the court is without jurisdiction to hear them. See, e.g., Young v. United States, 529 F.3d 1380, 1384 (Fed. Cir. 2008) (citing 28 U.S.C. § 2501 and John R. Sand & Gravel Co. v. United States, 552 U.S. 130, 133-39 (2008)). Generally, "a claim alleging a Fifth Amendment taking accrues when the act that constitutes the taking occurs." Ingrum v. United States, 560 F.3d 1311, 1314 (Fed. Cir. 2009) (citing Alliance of Descendants of Tex. Land Grants v. United States, 37 F.3d 1478, 1481 (Fed. Cir. 1994).

In some circumstances, however, determining the time of accrual is not as simple as identifying the time when the subject government action occurred. First, when the claimant is unaware of the potential claim, the accrual suspension doctrine may apply. As the Federal Circuit has explained:

> The accrual suspension rule is "strictly and narrowly applied," and the accrual date of a cause of action will be suspended in only two circumstances: "[the plaintiff] must either show that defendant has concealed its acts with the result that plaintiff was unaware of their existence or it must show that its injury was 'inherently unknowable'" at the time the cause of action accrued.

See id. at 1315 (citing Martinez v. United States, 333 F.3d 1295, 1319 (Fed. Cir. 2003) (en banc), quoting Welcker v. United States, 752 F.2d 1577, 1580 (Fed. Cir. 1985)). "The line of 'accrual suspension' cases dealing with takings claims has established that '[w]here the actions of the government are open and notorious . . . [the] plaintiff is on inquiry as to its possible injury,' and the statute of limitations begins to run." See id. (citing Coastal Petroleum Co. v. United States, 228 Ct. Cl. 864, 867 (1981)).

In addition, "in unique cases involving Fifth Amendment takings by continuous physical processes," accrual principles may be more leniently applied. Nw. La. Fish & Game Pres. Comm'n v. United States, 446 F.3d 1285, 1291 (Fed. Cir. 2006) (citing United States v. Dickinson, 331 U.S. 745, 749 (1947); Applegate v. United States, 25 F.3d 1579, 1582 (Fed. Cir. 1994)). This approach is commonly referred to as the stabilization doctrine, which was first articulated in United States v. Dickinson, 331 U.S. 745, 749 (1947). In Dickinson, the Supreme Court of the United States observed that when the government does not institute condemnation proceedings, but rather "le[aves]

the takings to physical events," it puts "on the owner the onus of determining the decisive moment in the process of acquisition by the United States when the fact of a taking could no longer be in controversy."  Dickinson, 331 U.S. at 748.  Put another way, the plaintiff may "postpon[e] suit until the situation becomes stabilized."  Id. at 749.  The Federal Circuit has since clarified that "it is the uncertainty surrounding the permanent nature of the taking, and not the uncertainty surrounding the ultimate extent of the erosion damage, that is critical in determining whether the situation has stabilized."  Boling, 220 F.3d at 1372.  The question of whether a particular situation has stabilized is an "elusive inquiry," and requires a fact-specific analysis.  George v. United States, 91 Fed. Cl. 177, 191 (2009).

Notwithstanding these doctrines, binding precedent holds that equitable tolling is not available to extend the limitations period.  See John R. Sand & Gravel, 552 U.S. at 133-34, 139.

      B.      Dismissal for Failure to State a Claim

A complaint should be dismissed under RCFC 12(b)(6) "when the facts asserted by the claimant do not entitle him to a legal remedy."  Lindsay v. United States, 295 F.3d 1252, 1257 (Fed. Cir. 2002).  To survive a motion to dismiss, a complaint must contain factual allegations that are "enough to raise a right to relief above the speculative level."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 545 (2007).  The basis for relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Id. at 555 (citations omitted).  However, "[i]n ruling on a RCFC 12(b)(6) motion to dismiss, the court must accept as true the complaint's undisputed factual allegations and should construe them in a light most favorable to plaintiff."  Bristol Bay Area Health Corp. v. United States, 110 Fed. Cl. 251, 259 (2013) (citing Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991)).

III.    Analysis

      A.      The Court Has Jurisdiction to Consider Plaintiffs' Claims

            1.      Plaintiffs Were Aware of the Levee and Resulting Floodwaters No Later than 2005

Defendant's argument with regard to the statute of limitations is a straightforward one.  It claims that "[t]here is no dispute that Welty was aware of the levee on the Givens property as early as 1999, when he first complained to both NRCS and the [USCE]," ECF No. 21 at 27, and that "[b]y 2005, the facts regarding Givens' levee and its impacts on Welty's property had sufficiently crystallized for Welty to file a lawsuit against the

United States," see id. at 28.  In that lawsuit, Welty specifically asked the court to order the removal of the "Dam and Levy system."  See Def.'s Am. Mot. to Dismiss, Exh. 3, ECF No. 21-1 at 171.  As such, defendant takes the position that plaintiffs' claim accrued years ago, and the statute of limitations has long since expired on any claims they may have had.  See ECF No. 21 at 29.

In response, plaintiffs argue that the complaints made in 1999 and 2005 related to "the impairment of the Wetlands by the Ditch, as exacerbated by the Levee, not interference with the Welty Cropland."  ECF No. 22 at 20.  Plaintiffs continue, explaining that the operative distinction with regard to the statute of limitations is that "[i]t was only with the complaint against Givens, filed December 23, 2014, that Plaintiffs raised the issue of the Welty Cropland being flooded" and "it was not until Givens' Motion to Dismiss . . . that Plaintiffs had actual or constructive notice that the Government put its imprimatur on the Levee by enrolling it as part of the Easement."  Id.

Plaintiffs allege that the affidavit attached to Givens's motion to dismiss the 2014 state court case put them on notice of defendant's involvement with the levee.  See Compl., Exh. 7, ECF No. 1-2 at 38-41.  In that affidavit, Givens states that his farm "has been enrolled in a conservation program since 1998."  See id. at 38.  Givens describes that program as involving "the building and maintenance of a filter strip around the perimeter of my farm which adjoins the Welty farm," in order to "protect bank erosion of the Whitewater River, provide wildlife habitat and serve as a buffer and filter between the farmland and the Whitewater River."  See id. at 38-39.  Givens also states that removal of the levee would "substantially eliminate and destroy the filter strip," which would in turn, "[b]reach the terms of my conservation contract" with defendant.  See id.

The field investigations, correspondence, and litigation involving the levee, which the court recited in detail above, buttress defendant's contention that plaintiffs have been aware of the levee and some potential impact on their property for nearly two decades. Indeed, plaintiffs concede as much in their response, stating that they "were clearly aware of the Levee from the time of its initial construction, and of the compounding effects of the Levee on the degradation of the Wetlands."  ECF No. 22 at 20.  Plaintiffs seek to distinguish those wetlands from the productive agricultural land that they allege was the subject of the 2014 state court case and is now the subject of this litigation.  See id.; see also ECF No. 1 at 10 ("The actions of the United States, in approving the Levee and requiring the maintenance thereof, have had the natural, direct, and probable result of inundating the soils of the Welty Farm to the point where they are no longer productive.").

Although it is conceptually possible to distinguish damage to wetlands (which plaintiffs claim was the subject of the 1999 administrative complaints and the 2005 federal court complaint) from damage to croplands (which plaintiffs argue is the subject

of the 2014 state court complaint and the current litigation), Welty acknowledged both types of damage in the 2005 lawsuit filed against the United States.  In the 2005 complaint, Welty asked the court to order the "Dam and Levy system that was built by Terry Givens on his adjoining farm [to] be removed due to redirection of flood waters across my farmland and wetlands."  See Def.'s Am. Mot. to Dismiss, Exh. 3, ECF No. 21-1 at 171 (emphasis added).

Plaintiffs contend that the mention of the levee in the 2005 complaint is of no moment because it appeared in the request for relief, but the factual allegations in the statement of the claim did not address the levee's effect on their property.  See ECF No. 22 at 23-24.  While it is true that the substantive allegations of the claim focus on the drainage ditch, see Def.'s Am. Mot. to Dismiss, Exh. 3, ECF No. 21-1 at 172-74, that does not serve as evidence that plaintiffs were unaware of the potential problem with the levee.  Plaintiffs carefully parse the language of Welty's request for relief in the 2005 complaint, arguing that "Welty used the term 'farmland' to mean 'land that is part of the Welty farm' rather than the Welty Cropland."  ECF No. 22 at 24.  This interpretation of Welty's previous pleading is contradicted, however, by the fact that the complaint stated that both "farmland," and separately "wetlands," had been affected by the floodwaters.  Def.'s Am. Mot. to Dismiss, Exh. 3, ECF No. 21-1 at 171.  Plaintiffs' position that they were unaware of any potential damage to productive agricultural land from the levee until 2013 is not supported by the record in this case.

The fact that plaintiffs were aware by 2005 that the levee was causing, or contributing to, flooding over both their farmland and wetlands, however, does not suffice to establish that their takings claim accrued at that time if the accrual suspension or stabilization doctrines operate.  In order to determine when plaintiffs' alleged takings claim accrued, the court considers in turn whether either of those doctrines apply in this case.

2.      The Accrual Suspension Doctrine Does Not Apply

As the court explained above, the applicability of the accrual suspension doctrine is restricted to two scenarios.  In particular, "the accrual date of a cause of action will be suspended [if plaintiffs] show that defendant has concealed its acts with the result that plaintiff[s were] unaware of their existence or . . . show that its injury was 'inherently unknowable' at the time the cause of action accrued."  Ingrum, 560 F.3d at 1315 (citations omitted).  Here, plaintiffs proceed on the theory that the accrual date for their takings claim was suspended by defendant's concealment.

In the complaint filed in the present case, plaintiffs state that even if "the taking of the Welty Farm was or reasonably should have been foreseeable prior to August 5, 2013 (at the absolute earliest), the United States has actively concealed its involvement with

the Levee." ECF No. 1 at 9. In support of this allegation, plaintiffs refer to the NRCS's response to their FOIA request. By letter dated July 31, 2015, the NRCS notified Welty that the information he had requested could not be released. See Compl., Exh. 2, ECF No. 1-2 at 9-10. Specifically, the letter explained that "[s]ection 1619 of the 2008 Farm Bill prohibit[s] our agency from releasing certain information that has been provided by agriculture producers and landowners for the purpose of participating in programs of the USDA." See id. at 10.

In their response to defendant's motion to dismiss, plaintiffs again refer to the July 31, 2015 FOIA letter as evidence of concealment. See ECF No. 22 at 20. Plaintiffs also cite to two additional points in the record, without offering any particular context for their inclusion. The first is a letter dated April 1, 1999, sent to Welty from the NRCS. See Def.'s Am. Mot. to Dismiss, Exh. 1, ECF No. 21-1 at 33. In the letter, the NRCS states its position that Welty should take up his complaints with Givens because participation in its programs is "strictly voluntary." Id. The NRCS continues: "Participants do check with our office to determine if proposed projects will be in violation of the USDA Food Security Act, as amended. Mr. Givens checked with our Jackson office to see if his proposed project would violate the Food Security Act. It did not." Id. The second additional citation is to a page in defendant's motion to dismiss Welty's 2005 federal court complaint. See Def.'s Am. Mot. to Dismiss, Exh. 4, ECF No. 21-1 at 186. On that page, defendant reiterates its position that any complaint Welty has is with Givens, not defendant. See id.

The court disagrees with plaintiffs that these three letters establish concealment on defendant's part. To the contrary, the course of correspondence between Welty and the NRCS in 1999, consisting of at least six letters from the NRCS to Welty, demonstrates that the agency was engaged and responsive to his concerns. See id. at 15-34 (collecting letters from NRCS to Welty dated January 13, 1999; January 28, 1999; February 5, 1999; March 9, 1999; March 15, 1999; and April 1, 1999). The same is true of the FOIA response letter dated July 31, 2015. See Compl., Exh. 2, ECF No. 1-2 at 9-10. Although the agency did conclude that Welty's FOIA request involved confidential information, it also provided a form for requesting information that would be available to Welty, and invited additional direct contact if Welty had any questions about the decision. See id. at 10.

It is worth noting that throughout the life of this dispute, defendant has maintained a consistent position—that Welty's complaints are properly directed to Givens because Givens's participation in defendant's program was voluntary in nature. See Def.'s Am. Mot. to Dismiss, Exh. 1, ECF No. 21-1 at 33 (stating, on April 1, 1999, that Welty's "issue . . . [is] with your neighbor Mr. Terry Givens," and emphasizing that participation in the NRCS program at issue is "strictly voluntary"); ECF No. 21 at 33 (stating that "the

11

levee in question is a private levee, not a government levee . . . constructed by [plaintiffs'] neighbor"); id. at 34 (characterizing the government program at issue as "a voluntary land conservation program").  The fact that plaintiffs disagree with defendant's position does not indicate that defendant has improperly hidden facts from plaintiffs relevant to the accrual of their claim.

### 3.    Accrual of Plaintiffs' Claim Was Postponed Pursuant to the Stabilization Doctrine

As the court previously explained, when a takings claim involves a continuous physical process, accrual principles may be more leniently applied, in accordance with the so-called stabilization doctrine.  See Nw. La. Fish & Game, 446 F.3d at 1291 (citing Dickinson, 331 U.S. at 749; Applegate, 25 F.3d at 1582).  The stabilization doctrine allows plaintiffs to "postpon[e] suit until the situation becomes stabilized."  Dickinson, 331 U.S. at 749.  "Stabilization occurs when it becomes clear that the gradual process set into motion by the government has effected a permanent taking, not when the process has ceased or when the entire extent of the damage is determined."  Boling, 220 F.3d at 1370-71.

Here, plaintiffs allege that they were unaware, until August 5, 2013, that the levee "would result in a permanent loss of any of the Welty Farm, due to increased inundation and flooding."  ECF No. 1 at 9 (emphasis in original).  They also state that they were unaware, until September 16, 2014, that the flooding caused by the levee "would result in the permanent loss of all beneficial use of the Welty Farm as productive agricultural land."  Id.  Defendant challenges the veracity of these jurisdictional facts in its motion to dismiss.  As the court has previously discussed, defendant makes much of the evidence that plaintiffs were aware of the levee and resulting floodwaters as early as 1999, and certainly by 2005.  Plaintiffs admit as much.  See ECF No. 22 at 20 (stating that they "were clearly aware of the Levee from the time of its initial construction, and of the compounding effects of the Levee on the degradation of the Wetlands").  The logic underpinning the stabilization doctrine, however, is that awareness that the levee caused flooding is not necessarily the same as having a clear indication that a permanent taking has occurred.

In this case, plaintiffs claim that the alleged taking was not foreseeable until "at the earliest, August 5, 2013."  ECF No. 1 at 9.  Aside from establishing plaintiffs' knowledge of the levee and some degree of flooding, defendant has not presented any evidence to persuade the court that a permanent taking was reasonably foreseeable before that time.  Instead, in an attempt to rebut plaintiffs' arguments relating to operation of the stabilization doctrine, the government asserts that it did not "'set in motion' the process Plaintiffs allege caused harm to their land," because it did not acquire a

conservation easement or any property interest in Givens's land, and it did not authorize or have any responsibility for the construction of the levee or require that it be maintained.   ECF No. 23 at 12.   As such, according to defendant, the stabilization doctrine does not apply to postpone accrual.

Sorting out the facts necessary to determine jurisdiction from those necessary to state a claim for relief, particularly in the context of a takings case, is not always a simple task.   In its seminal opinion on takings jurisdiction, Jan's Helicopter, the Federal Circuit reviewed the long history of precedent grappling with this issue.   The court concluded its analysis, stating the rule as follows:

> In determining whether the Court of Federal Claims has jurisdiction, all that is required is a determination that the claim is founded upon a money-mandating source and the plaintiff has made a nonfrivolous allegation that it is within the class of plaintiffs entitled to recover under the money-mandating source.   There is no further jurisdictional requirement that the court determine whether the additional allegations of the complaint state a nonfrivolous claim on the merits.

See Jan's Helicopter, 525 F.3d at 1309.

The muddled intersection of facts supporting the court's jurisdiction and those supporting the merits of a case is well-illustrated here.   The crucial point of contention between the parties is this—plaintiffs claim that defendant requires Givens to maintain his property in a manner that causes damage to plaintiffs' property, while defendant denies that it requires Givens to do anything.   The court obviously must resolve questions relating to defendant's involvement with Givens's property in evaluating the merits of plaintiffs' case.   Federal Circuit precedent in Jan's Helicopter, 525 F.3d at 1309, and Boling, 220 F.3d at 1370-71, however, appear somewhat at odds with regard to the degree to which the court should consider defendant's involvement with Givens's property in determining whether the stabilization doctrine applies in this instance.

According to Jan's Helicopter, the court's jurisdictional inquiry should be limited to determining whether plaintiffs' "claim is founded upon a money-mandating source" and whether plaintiffs have "made a nonfrivolous allegation that [they are] within the class of plaintiffs entitled to recover under the money-mandating source."   Jan's Helicopter, 525 F.3d at 1309.   In order to determine whether the stabilization doctrine applies, under Boling, the court must consider the more substantive and fact-intensive matter of when it was clear "that the gradual process set into motion by the government has effected a permanent taking" of plaintiffs' property.   Boling, 220 F.3d at 1370-71.   Because whether there was government action for purposes of the stabilization doctrine

bears on the accrual of plaintiffs' claim, which in turn determines the jurisdictional matter of when the statute of limitations on that claim expires, these authorities are problematically intertwined.

After careful consideration of this conflict, the court concludes that the best course is to strictly apply the rule as stated in Jan's Helicopter, and to take plaintiffs' allegations relating to the stabilization doctrine as true for purposes of determining jurisdiction. As the Federal Circuit noted in Jan's Helicopter, if plaintiffs cannot recover on their claim—here allegedly due to the lack of government action—the court should dismiss the case for failure to state a claim on which relief can be granted, pursuant to RCFC 12(b)(6). See 525 F.3d at 1308.

Plaintiffs have met the jurisdictional test set forth in Jan's Helicopter. First, plaintiffs have demonstrated that their claim is founded upon a money-mandating source. Id. at 1309. In the complaint, plaintiffs allege that defendant is liable for "a taking of their land and other property . . . for public use through inverse condemnation, without exercising the power of eminent domain and without providing Plaintiffs just compensation therefor, in violation of the U.S. Constitution, federal statutes, and federal regulations." ECF No. 1 at 1. Such takings claims, which arise under the Fifth Amendment to the Constitution of the United States, fall squarely within this court's purview. See Mildenberger, 643 F.3d at 944-45 ("When the Government takes property but fails to compensate the owner, the Tucker Act provides jurisdiction to enforce the owner's compensatory right.") (citing Boling, 220 F.3d at 1370); Jan's Helicopter, 525 F.3d at 1309 ("It is undisputed that the Takings Clause of the Fifth Amendment is a money-mandating source for purposes of Tucker Act jurisdiction.").

And second, plaintiffs have alleged that they own the property supposedly taken by the government. See ECF No. 1 at 5. Defendant does not dispute plaintiffs' ownership of the property at issue. As such, plaintiffs have "made a nonfrivolous allegation that [they] are within the class of plaintiffs entitled to recover under the money-mandating source." Jan's Helicopter, 525 F.3d at 1309.

### B.    Plaintiffs Have Failed to State a Claim for Which Relief Can Be Granted

In order to state a claim for a taking, plaintiffs must establish: (1) that they hold a valid property interest, and (2) that "all or a part of that interest has been appropriated by the government for a public use." Textainer Equip. Mgmt. Ltd. v. United States, 115 Fed. Cl. 708, 712 (2014) (citing Klamath Irr. Dist. v. United States, 635 F.3d 505, 511 (Fed. Cir. 2011)). "Put another way, the government's actions must appropriate a benefit for the government at the expense of the property owner." Id. (citing Moden v. United States, 404 F.3d 1335, 1339 (Fed. Cir. 2005); Ridge Line v. United States, 346

F.3d 1346, 1356 (Fed. Cir. 2003)). Inherent in the action of appropriation is an element of coercion. A taking involves a government action in which the landowner is given no choice but to abdicate some degree of control over the subject property. See e.g., BMR Gold Corp. v. United States, 41 Fed. Cl. 277, 282 (1998) (finding no taking where a plaintiff granted permission to the military to cross his land, and so "lack[ed] the necessary element of coerciveness" for a taking). Furthermore, "[t]here . . . can be no taking when [the] acts complained of are those of private parties, not the government." Alves v. United States, 133 F.3d 1454, 1458 (Fed. Cir. 1998); see also A & D Auto Sales, Inc. v. United States, 748 F.3d 1142, 1154 (Fed. Cir. 2014) (stating that the government may be liable for a taking through the actions of a third party but only when that party "is acting as the government's agent or the government's influence over the third party was coercive rather than merely persuasive").

Plaintiffs allege a property interest in the land at issue. See ECF No. 1 at 5 (alleging that plaintiffs inherited the land at issue as joint tenants with rights of survivorship when their mother passed, on March 18, 2016). Defendant does not dispute plaintiffs' ownership. Plaintiffs further acknowledge, despite their characterization of the agreements Givens entered into with defendant, that he owns the property on which the offending dam and levee are built. See id. at 7 (alleging that the "USDA (through the CCC and NRCS) designed the conservation plan . . . that would and does apply to the Easement that it oversees and enforces, with input from Givens as the underlying landowner") (emphasis added).

Plaintiffs, however, do not allege any coercive or appropriating action on defendant's part. Plaintiffs allege that Givens entered into a series of contracts with defendant relating to conservation programs. See id. at 6-7. The earliest of these agreements was allegedly entered into in 1998, the year in which Givens purchased his property. See id. at 5-6. As support for this assertion, plaintiffs cite to an affidavit signed by Givens in the 2014 state court case, in which he states that his farm "has been enrolled in a conservation program since 1998." Compl., Exh. 7, ECF No. 1-2 at 38. Givens describes that program as involving "the building and maintenance of a filter strip around the perimeter of my farm which adjoins the Welty farm," in order to "protect bank erosion of the Whitewater River, provide wildlife habitat and serve as a buffer and filter between the farmland and the Whitewater River." Id. at 38-39. In the affidavit, Givens also states that removal of the levee would "substantially eliminate and destroy the filter strip," which would in turn, "[b]reach the terms of my conservation contract" with defendant. Id.

Beyond this initial contract, plaintiffs allege that Givens entered into two additional conservation contracts with defendant: (1) for the period from October 1, 2000 through September 30, 2010; and (2) for the period from October 1, 2010 through

September 30, 2025.  See ECF No. 1 at 7.  Plaintiffs allege that Givens was required to maintain the levee pursuant to these contracts.  See id. at 10.  Even assuming that was true, at no point in the complaint or in plaintiffs' briefs do they contend that Givens was required by defendant to enter into any of these agreements.  The parties argue at length about what the terms of the contracts require Givens to do, see ECF No. 21 at 32-38; ECF No. 22 at 26-29; ECF No. 23 at 6-10, but the court has no reason to believe that Givens's participation in the contractual relationship with defendant was anything but voluntary.  The voluntary nature of these agreements is fundamentally at odds with the coercion required to support a takings claim.  To the extent any of the alleged damage to plaintiffs' property is related to modifications made or maintenance performed for purposes of complying with the terms of the CRP, that damage is a result of Givens's voluntary decision to participate in that program, not the result of any actions required by or coerced by defendant.

Plaintiffs have failed to identify any action on defendant's part that rises to the level of appropriation.  As such, they have failed to establish a necessary element of their alleged takings claim.  Accordingly, plaintiffs' takings claim must be dismissed for failure to state a claim upon which relief can be granted, pursuant to RCFC 12(b)(6).

IV.    Conclusion

For the foregoing reasons, defendant's amended motion to dismiss, ECF No. 21, is **GRANTED**.  The clerk's office is directed to **ENTER** final judgment in favor of defendant **DISMISSING** with prejudice plaintiffs' complaint for failure to state a claim upon which relief may be granted.  Each party shall bear its own costs.


IT IS SO ORDERED.

s/ Patricia E. Campbell-Smith
PATRICIA E. CAMPBELL-SMITH
Judge